Wayne A. BRIESEMEISTER and
Cindy J. Briesemeister,
Plaintiffs-Appellants-Cross-Respondents,

v.

Philip LEHNER, Donn Vaudreuil,
Sally Eickelmann, John A. Lehner,
Louise Vaudreuil Linneman, Robert H. Lehner,
Jr. a/k/a Robert H. Lehner Jr., M.D.,
James Hoadley, Betsy Tishler, Michael P. Lehner,
David L. Lehner, Joseph Reed Millsaps, a/k/a
J. Reed Millsaps, and Nina Millsaps,
Defendants-Respondents-Cross-Appellants.

Court of Appeals

*No. 2005AP1237. Submitted on briefs April 20, 2006.
—Decided June 28, 2006.*

2006 WI App 140

(Also reported in 720 N.W.2d 531.)

430

On behalf of the plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *John V. O'Connor* of *O'Connor, DuMez, Alia & McTernan, S.C.*, Kenosha.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the brief of *Robert E. Hankel* of *Hankel, Bjelajac, Kallenbach, Lehner & Koenen, L.L.C.*, Racine, and *J. Reed Millsaps*, Northbrook, Illinois.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

¶ 1. NETTESHEIM, J. Disappointed potential buyers Wayne and Cindy Briesemeister sued to enforce a real estate contract on a residence ultimately sold by the Lehner group[1] to Joseph and Nina Millsaps. The Lehner group and the Millsaps brought counterclaims relating to the Briesemeisters' filing of a lis pendens. On competing motions for summary judgment, the trial court dismissed the Briesemeisters' claims. The counterclaims were dismissed following a trial to the court.

¶ 2. The Briesemeisters appeal from the portion of the judgment dismissing their claim for specific performance. The Millsaps and the Lehner group cross-

---

[1] The sellers are ten remainderpersons of a life estate. This opinion will refer to them as the "Lehner group."

appeal from the portion of the judgment dismissing their counterclaims. We hold that, under the terms of the contract, the Briesemeisters' delivery of notices of defect relinquished to the Lehner group, as sellers, all control over the consummation of the transaction, including whether to respond to the notices or to the Briesemeisters' later attempt to revive the deal, and whether to sell to another buyer.

¶ 3. We also hold that there is no evidence that the Briesemeisters' filing of the lis pendens was frivolous or that their attempt to elevate their contract over that of the Millsaps and the Lehner group was improper. Accordingly, we reject both the appeal and cross-appeal and affirm the judgment in full.

## BACKGROUND

¶ 4. This case involves a dispute over whether the Briesemeisters or the Millsaps are the rightful buyers of the residence located on 68th Street in the City of Kenosha and offered for sale by the Lehner group.

¶ 5. In April 2003, the Briesemeisters contacted realtor Robert Wagner to assist them in their search for a house. Wagner was an independent contractor associated with The Jacobson Group/GMAC Real Estate. Wagner showed the Briesemeisters[2] several houses, and in May 2003, showed them the 68th Street property. After several more viewings of that property and others, the Briesemeisters executed a WB-11 Residential Offer to Purchase on June 23, offering $271,000. After a series of counteroffers, the Briesemeisters signed the Lehner group's "WB-44 Counter-Offer" of $276,000 on

---

[2] We use "the Briesemeisters" although during this period Cindy Briesemeister was in Tennessee where the couple owned a home. She viewed the 68th Street property only by videotape.

July 1, 2003. The counteroffer provided that "[a]ll terms and conditions remain the same as stated in the Offer to Purchase except the following." The four exceptions listed related to the new price, a clarification about access to a closet, the closing date and a requirement that both buyers sign the counteroffer.

¶ 6. The Offer to Purchase contained a financing contingency and an inspection contingency granting the Lehner group the right to cure any defects identified. The "Right to Cure" provision of the Offer to Purchase provided:

> *RIGHT TO CURE:* Seller (shall)(~~shall not~~) STRIKE ONE have a right to cure the defects. (Seller shall have a right to cure if no choice is indicated.) If Seller has right to cure, Seller may satisfy this contingency by: (1) delivering a written notice within 10 days of receipt of Buyer's notice of Seller's election to cure defects, (2) curing the defects in a good and workmanlike manner and (3) delivering to Buyer a written report detailing the work done no later than 3 days prior to closing. *This Offer shall be null and void if Buyer makes timely delivery of the above notice and report and:* (1) Seller does not have a right to cure or (2) *Seller has a right to cure but: a) Seller delivers notice that Seller will not cure or b) Seller does not timely deliver the notice of election to cure.* (Italics added.)

In addition, the Offer to Purchase provided, "Once received, a notice cannot be withdrawn by the Party delivering the notice without the consent of the Party receiving the notice."

¶ 7. After signing the counteroffer, the Briesemeisters invoked the inspection contingency, and hired three inspectors.

¶ 8. On July 11, Wagner delivered on the Briesemeisters' behalf two notices of defects, or "WB-41 no-

tices," to Colleen Deininger, the Lehner group's real estate broker, listing defects to which the Briesemeisters objected and wanted the sellers to address. The first notice stated: "Buyer requests seller to cure the following issues," and listed nine defects identified during the inspections. The defects ranged in severity from a loose toilet base and outdated light fixtures in the closets, to evidence of squirrel and skunk infestation and possible asbestos in some components of the heating system. The second notice related only to the possible asbestos and advised that the Briesemeisters intended to submit samples of the boiler pipe wrap for testing. This second notice also demanded that the Lehner group agree to pay for the cost of asbestos removal or remediation in excess of $1500 or the Briesemeisters would have forty-eight hours to decide whether to consider the offer null and void. The top of WB-41 notices read in bold lettering: **"Caution: Use A WB-41 Notice If A Party Is Giving A Notice Which Does Not Require The Other Party's Agreement. Use A WB-40 Amendment If Both Parties Will Be Agreeing To Modify The Terms Of The Offer."**

¶ 9. Wagner understood that the issuance of a notice of defect required no response from the seller and could serve to terminate the offer. He also understood that a WB-40 amendment, requiring both parties' agreement, would be used if a party wanted to negotiate terms stated in the offer. Wagner told the Briesemeisters that if they gave notice of material defects, the Lehner group did not have to cure the defects, but could instead walk away, thereby "kill[ing] the deal." Thus, Wagner advised the Briesemeisters to limit the list of defects to major or safety-related items. Wayne Briesemeister did not give Wagner a green light to negotiate any items on the list,

however, and Wagner believed that Wayne "felt strongly" that all of the listed defects had to be either repaired or replaced.

¶ 10. Upon receipt of the hand-delivered notices from Wagner, Deininger confirmed that Wagner understood the significance of the delivery. Deininger thought that the Briesemeisters were "nitpicking" and that the transaction would be difficult to close. Deininger faxed the notices to the Lehner group, although she did not believe they would agree to the repairs and the cost of asbestos remediation. Thus, she advised Wagner that essentially "the deal was dead." When Wagner expressed a desire to negotiate, Deininger told him, "Well, once you give a notice, as you know, the decision on how to proceed is up to the seller."

¶ 11. After delivering the two WB-41 notices, the Briesemeisters began to have second thoughts because of the language in the Offer to Purchase that "[o]nce received, a notice cannot be withdrawn by the Party delivering the notice without the consent of the Party receiving the notice." Worried they might lose the house, Wayne instructed Wagner to "get rid of those notices and remove my financing contingency." Wagner telephoned the Wisconsin Realtors Association (WRA) hotline to ask how to "get out of" the notices. Richard Staff, then WRA general counsel, told Wagner that "the only thing you could possibly do would be to draft an amendment and get the other party to agree to removing your notices." Following up on this advice, the Briesemeisters submitted an amendment dated July 17 removing the financing contingency and withdrawing the two notices, "[d]eeming the Inspection and Testing contingencies satisfied."

¶ 12. Meanwhile, back on July 6, the Lehner group's realtor had shown the 68th Street property to the Millsaps. This was in keeping with the realtor's

policy to continue to market a property so as to have a backup buyer in case an inspection contingency "goes bad like a number of them do." On July 16, the Millsaps submitted an Offer to Purchase for $280,000. The Millsaps' offer also contained financing and inspection contingencies, and proposed that certain items of personal property be included.

¶ 13. Philip Lehner, the member of the Lehner group acting as its power of attorney, did not fully discuss with Deininger the Millsaps' offer vis-à-vis the Briesemeisters' amendment until July 18. This discussion produced some disagreement between the two as to how, or whether, to respond to the Briesemeisters' attempt to withdraw the notices of defects. Like Wagner, Deininger also contacted Staff, the WRA attorney. Based on that conversation and her review of the Offer to Purchase, Deininger felt confident that doing nothing in regard to the Briesemeisters' notices of defects and proposed amendment would effectively terminate the contract. On that same day, the Lehner group extended a counteroffer to the Millsaps.

¶ 14. On July 19 or 20, Deininger verbally told Wagner that the Lehner group had accepted another offer, and that the deal with the Briesemeisters "is dead, move on." The Briesemeisters immediately delivered a second amendment reiterating the withdrawal of the notices and removal of the contingencies and offering "[p]urchase price in other bona fide offer plus $5,000."

¶ 15. The Lehner group rejected the amendment, writing across it, "Rejected. Philip Lehner, Individually & P.O.A 7/21/03." That same day, the Lehner group, via Deininger, hand-delivered the notated amendment and the Briesemeisters' earnest money to Margaret Jacobson, owner of the Jacobson Group, the realty company with whom Wagner was associated as an independent

contractor. Delivery was made to Jacobson because Wagner had prior plans to be out of town. Jacobson telephoned Wagner and also immediately contacted Attorney J. Michael McTernan, whose office handled legal issues for the Jacobson Group.

¶ 16. Later that day, McTernan notified Deininger that the Briesemeisters were "ready, willing and able to close this transaction," and submitted a third WB-41 notice again revoking all contingencies as well as "[a]ny other contingency of Buyer." However, the Lehner group stood firm on its intent to honor its contract with the Millsaps.

¶ 17. On August 27, the Briesemeisters filed suit and followed with a lis pendens on August 28. The suit demanded that the contract between the Millsaps and the Lehner group be declared null and void and that the Lehner group deliver to the Briesemeisters good and clear title to the property. The Millsaps and the Lehner group both counterclaimed, alleging slander of title and asking that the lis pendens be discharged and punitive damages awarded. In addition, the Lehner group alleged tortious interference with contract, and the Millsaps sought a declaration that they, and not the Briesemeisters, had an enforceable contract to purchase the property.[3]

¶ 18. The Millsaps then moved for judgment on the pleadings. The motion was heard by Judge Wilbur W. Warren III, who denied the motion, ruling that, since the Briesemeisters' waiver of the contingencies and the Lehner group's rejection of the offer both were dated July 21, a question of fact existed as to which occurred first.

---

[3] During the course of the litigation, the parties' real estate agencies and individual realtors also were named as parties, but later were dismissed.

439

¶ 19. Discovery continued, and in February 2004, the Millsaps, the Lehner group and the Briesemeisters all moved for summary judgment. By this time the case had been transferred to Racine County Circuit Court Judge Charles Constantine, sitting by substitution. It is Judge Constantine's rulings that we review on this appeal. Judge Constantine denied the Briesemeisters' motion, granted the Millsaps' and Lehner group's motions,[4] discharged the lis pendens, and scheduled the counterclaims for trial.

¶ 20. After a two-day trial to the court, Judge Constantine ruled that the Millsaps did not have standing to bring the slander of title counterclaim and that Joseph Millsaps, an attorney and party, could not recover costs entailed in removing the lis pendens, due to his personal interest. As to the Lehner group, Judge Constantine ruled that both the slander of title and the tortious interference with contract counterclaims failed because the lis pendens was not filed with actual knowledge that the documents or the theory of recovery was frivolous, and that the Briesemeisters' legal position, while unsuccessful, was not untenable. The Briesemeisters appeal; the Millsaps and the Lehner group cross-appeal.

### APPEAL

¶ 21. The Briesemeisters appeal the grant of summary judgment to the Millsaps and the Lehner group. Summary judgment methodology is well established and need not be repeated here. *See, e.g., Green Spring*

---

[4] The Briesemeisters' petition for leave to appeal the order granting the opposing motions for summary judgment was denied.

*Farms v. Kersten*, 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987). In essence, summary judgment is appropriate when no material factual dispute exists and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2003–04).[5] We review summary judgment de novo, applying the same method as the trial court. *Green Spring Farms*, 136 Wis. 2d at 315. In addition, our review requires that we interpret the language of the real estate contract. The construction of a written contract also is a question of law that we review without deference. *Galatowitsch v. Wanat*, 2000 WI App 236, ¶ 11, 239 Wis. 2d 558, 620 N.W.2d 618.

*Withdrawal of Notices/Waiver of Contingencies*

¶ 22. After invoking the inspection contingency, the Briesemeisters delivered two notices of defect, one enumerating nine alleged defects, the other limited to asbestos. Approximately one week later, the Briesemeisters attempted to withdraw the notices and waive the inspection and financing contingencies. The Briesemeisters focus their appellate argument on the waiver of contingencies. They contend that nothing in the contract prohibited waiver of the contingencies and, absent notice from the sellers terminating the contract, the waiver was accomplished before the contract expired. However, the Briesemeisters' framing of their argument fatally disregards the decisive potential consequences of their delivery of the notices of defect.

¶ 23. On July 11, the Briesemeisters delivered to the Lehner group two notices of defect. Per the Offer to Purchase, this delivery afforded the Lehner group, as sellers, three options: (1) deliver, within ten days, writ-

---

[5] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

ten notice of its intent to cure the defects; (2) deliver notice that it would not cure the defects; or (3) do nothing. The Lehner group did nothing. By the contract's own terms, the Lehner group's inaction rendered the Offer "null and void."

¶ 24. The Briesemeisters maintain, however, that the contract remained vital and that nothing in it barred them from waiving their contingencies. In a vacuum, or under different facts, that argument may have some merit. Here, however, the Briesemeisters themselves modified the standard WB-40 amendment language by adding the following to their July 17 amendment: "1) Buyer withdraw[]s two Notices numbered #1 & #2 delivered July 11th, 2003. Deeming the Inspection and Testing contingencies satisfied." The Briesemeisters' second WB-40 amendment on July 20 essentially repeated that language. But these so-called waivers of contingencies were not simply waivers; they also attempted to withdraw the notices of defects. This is critical, because the Offer to Purchase expressly provides that "[o]nce received, a notice cannot be withdrawn by the Party delivering the notice without the consent of the Party receiving the notice." It is undisputed that the Lehner group did not consent to the withdrawal of the notices.

¶ 25. The clarity of the language notwithstanding, the Briesemeisters assert that Judge Constantine erred by "blur[ring] the distinctions between the 'withdrawal' of a notice, and a 'waiver' of a contingency." They urge us to adopt the construction endorsed by Judge Warren at the hearing on the motion for judgment on the pleadings. Judge Warren read the notice-withdrawal provision to mean that a party cannot unilaterally withdraw a notice "that would otherwise be of some detriment to themselves and not to the party being relieved of the obligation." The Briesemeisters contend that they should be

permitted to withdraw the inspection contingency because it worked only to their own benefit and the Lehner group had no protectible interest in it. They cite *Godfrey Co. v. Crawford,* 23 Wis. 2d 44, 49, 126 N.W.2d 495 (1964), in support, where the supreme court upheld the right of a party to a contract to waive a zoning contingency for that party's benefit so that the contract could go forth.

¶ 26. We agree that *Godfrey Co.* shares certain factual similarities with this case. In *Godfrey Co.*, the defendant sellers accepted plaintiff Godfrey Company's written Offer to Purchase on a parcel of land. *Id.* at 46. The offer contained two provisions regarding rezoning of the property, which provided that the offer would be null and void if the rezoning was unsuccessful or could not be consummated by March 1, 1963, or if the sellers were unable to comply due to a title defect. *Id.* On February 26, the Godfrey Company notified the sellers that it was waiving the rezoning condition. *Id.* at 47. On March 7, sellers conveyed the premises to another buyer, and Godfrey Company sued for specific performance on the contract. *Id.* at 46–47.

¶ 27. The supreme court upheld the Godfrey Company's right to waive the rezoning condition. In so ruling, however, the court identified "the crucial issue" to be "whether, *under the terms of the contract* . . . the buyer had the right . . . to waive the condition . . . ." *Id.* at 48 (emphasis added). But, unlike the contract in this case, the court's discussion of the parties' agreement does not reveal any provision that specifically prohibited the withdrawal of a notice or required the consent of the other party to the withdrawal.[6]

---

[6] We do know that *Godfrey Co. v. Crawford,* 23 Wis. 2d 44, 126 N.W.2d 495 (1964), did not examine the WB-11 Residential

¶ 28. Thus, despite the facial similarities to *Godfrey Co.*, this case does not compel the same result. *Godfrey Co.* controls this case only insofar as we are directed to look to the language of the parties' contract. And here the language could not be more plain: "Once received, a notice cannot be withdrawn by the Party delivering the notice without the consent of the Party receiving the notice." The Lehner group did not consent to the Briesemeisters' attempt to withdraw either notice. Restyling the attempted withdrawal of notice as a waiver of contingency is insufficient. Without the Lehner group's consent, the notices could not be withdrawn.

¶ 29. Moreover, this is not merely an academic exercise. Both realtors recognized, and the Briesemeisters were cautioned, that delivering a notice carried grave potential implications for them as hopeful buyers. The enormity of the step is made clear in a treatise co-authored by Staff, the then general counsel for WRA to whom the Briesemeisters' own realtor turned for advice. Staff cautions buyers to appreciate the significance of delivering a notice of defects:

> With respect to those items in the inspection report(s) which are defects . . . the buyer may consider giving a notice of defects. The buyer must understand, however, that this is a serious step. If the seller has the right to cure, the seller may choose, in his or her discretion, whether to cure the listed defects or let the offer become null and void. If the seller has another more desirable offer, one may assume that the seller will let the offer die.

---

Offer to Purchase form at issue here. The current form states that it was approved by the Wisconsin Department of Regulation and Licensing for optional use on April 1, 1999, and mandatory use on November 1, 1999.

Scott C. Minter and Richard J. Staff, Wisconsin Real Estate Law, § 7.08(A), at 184 (Univ. of Wis. Law School 2001). Staff explains the underlying rationale:

> **3. *No Withdrawal of Notices.*** The Department-approved [WB-11] offers also provide that one party may not withdraw a notice that has been received by the other party, at least not without the other party's consent. This provision is similar to the common law doctrine that a notice cannot be withdrawn if the party who has received the notice takes action in reliance upon the notice . . . . This will mean that, for example, a buyer who gives a notice of defects will not be permitted to unilaterally change his or her mind and withdraw the notice of defects once it has been received by the seller.

*Id.*, § 7.09(G), at 203–04.

¶ 30. The Briesemeisters insist, however, that the withdrawal of a notice is not the same as the waiver of a contingency. We agree—but, as we have already noted, that argument misses the mark. The July 11 delivery of the notices ceded control to the Lehner group and triggered the options available to it as sellers, one of which was to do nothing, let the offer expire, and negotiate with other buyers. Withdrawing the contingencies or notices of defect several days later was immaterial to the events set in motion by the giving of the notices. We do not decide whether an inspection contingency can be waived under other circumstances. We decide only that the notices could not be withdrawn under this contract unless the Lehner group consented. The language of the contract is clear, and neither *Godfrey Co.* nor any other authority the Briesemeisters cite permits us to overrule a contract's express language. The Briesemeisters chose to proceed in the fashion they did despite contrary advice from their realtor. By doing so, they miscalculated their risk.

## *Timeliness of Attempted Waiver*

¶ 31. The Briesemeisters maintain that a correct framing of the issue is whether they waived the inspection contingency before the contract was terminated. We disagree. The contract did not obligate the sellers to respond. The Briesemeisters chose the notices; the Lehner group legitimately chose another buyer. Therefore, having concluded that delivering the notice of defects sent the ball into the Lehner group's court, addressing the timeline involved in any attempted waiver is unnecessary.

## *Effectiveness of Notice*

■

¶ 32. The Briesemeisters next argue that the Lehner group could have terminated the contract by delivering an effective notice that "Seller will not cure." Specifically, the Briesemeisters contend that the Lehner group failed to provide notice in accord with the directives of the Offer to Purchase. However, as we have already held, the parties' contract did not obligate the Lehner group to provide *any* notice. Thus, we reject the Briesemeisters' argument on this threshold basis. However, since the Lehner group has responded to the Briesemeisters' argument on the merits, we also address the issue in the alternative.

¶ 33. As early as July 11, Deininger, the Lehner group's realtor, told Wagner, the Briesemeisters' realtor, that "the deal was dead." On July 21, the Lehner group personally delivered their written rejection of the amendment to Margaret Jacobson of the Jacobson Group because Wagner was out of town. The Briesemeisters maintain that, per the terms of the contract,

446

the Lehner group's oral notice did not suffice and the delivery of the written rejection was ineffective because delivery was not made to Wagner.

¶ 34. As it relates to delivery, the Offer to Purchase provided, in relevant part:

DELIVERY OF DOCUMENTS AND WRITTEN NO-TICES Unless otherwise stated in this Offer, delivery of documents and written notices to a Party shall be effective only when accomplished by one of the methods specified [below].

(1) [Describing mail delivery]

. . . .

Seller's recipient for delivery (optional): Colleen Deininger c/o C-21 Colleen Realty

. . . .

Buyer's recipient for delivery (optional): Robert Wagner c/o Jacobson Group GMAC Real Estate

(2) By giving the document or written notice personally to the Party, or the Party's recipient for delivery if an individual is designated [above].

(3) By fax transmission of the document or written notice . . . .

DELIVERY/RECEIPT . . . Personal delivery to, or actual receipt by, any named Buyer or Seller constitutes personal delivery to, or actual receipt by Buyer or Seller.

¶ 35. The oral notice prong of the Briesemeisters' argument fails not because oral notice is sufficient; under this contract, it is not. It fails because, as we have repeatedly noted, the Lehner group was not obliged to give *any* notice.

447

¶ 36. The written notice aspect of the Briesemeisters' argument also is without merit. First, the Offer to Purchase provides that "[p]ersonal delivery to, or actual receipt by, any named Buyer . . . constitutes personal delivery to or actual receipt by Buyer . . . ." Wayne Briesemeister acknowledged receiving the document by facsimile on July 21.

¶ 37. Second, the Lehner group's written rejection of the Briesemeisters' attempted withdrawal of the notices was delivered to the Briesemeisters "c/o Jacobson Group GMAC Real Estate," the realtor with whom Wagner was associated. The agency agreement between the Briesemeisters and Wagner provided that Wagner was the agent for the Jacobson Group, and that the Jacobson Group, as broker, had the exclusive right to act as the Briesemeisters' agent. Thus, the written notice to the Briesemeisters' agent constituted notice to the Briesemeisters. *Tele-Port, Inc. v. Ameritech Mobile Commc'ns, Inc.*, 2001 WI App 261, ¶ 7, 248 Wis. 2d 846, 637 N.W.2d 782 (Notice to an agent is imputed to the principal if the matter about which notice is given is relevant or pertinent to the subject matter of the agency.). This same principle of law compels us to reject the Briesemeisters' related argument that the Lehner group's rejection notice was insufficient because it was delivered to Margaret Jacobson, not Wagner.

¶ 38. We reject the Briesemeisters' arguments and affirm the trial court's grant of summary judgment to the Lehner group and the Millsaps.

## CROSS-APPEAL

¶ 39. The Lehner group and the Millsaps launched various counterclaims relating to the Briesemeisters filing of the lis pendens. Both had counter-

claimed for slander of title, the Lehner group alone counterclaimed for tortious interference with contract, and the Millsaps sought attorney fees. After a bench trial, the trial court dismissed the counterclaims and discharged the lis pendens. We affirm the court's ruling in all respects.

*Slander of Title*

¶ 40. The Lehner group and the Millsaps contend that the Briesemeisters filed the lawsuit and lis pendens despite knowing that their contract was null and void. A lis pendens serves as notice of pending litigation that may affect real estate. *Zweber v. Melar Ltd.*, 2004 WI App 185, ¶ 6, 276 Wis. 2d 156, 687 N.W.2d 818. Wisconsin's lis pendens statute, WIS. STAT. § 840.10(1)(a), requires filing notice of litigation with the register of deeds. *See Kensington Dev. Corp. v. Israel*, 142 Wis. 2d 894, 901–02, 419 N.W.2d 241 (1988). Filing a lis pendens that the plaintiff knows or should have known is false, a sham or frivolous is actionable in damages, including punitive damages. *Id.* at 902–03; WIS. STAT. § 706.13.[7]

¶ 41. The trial court had decided on summary judgment that the Briesemeisters' attempted with-

---

[7] WISCONSIN STAT. § 706.13, governing slander of title, provides in relevant part:

(1) In addition to any criminal penalty or civil remedy provided by law, any person who submits for filing, entering in the judgment and lien docket or recording, any . . . lis pendens . . . relating to . . . the title to real . . . property, and who knows or should have known that the contents or any part of the contents of the instrument are false, a sham or frivolous, is liable in tort to any person interested in the property whose title is thereby impaired, for punitive damages of $1,000 plus any actual damages caused by the filing, entering or recording.

drawal of their notices of defects doomed their claim for specific performance. As a result, the Millsaps acquired ownership of the property. At the ensuing bench trial on the counterclaims of the Lehner group and the Millsaps, the court ruled that its earlier decision did not compel the conclusion that the Briesemeisters knew or should have known that filing the suit and lis pendens was false, a sham or frivolous.

¶ 42. Inquiries about frivolousness involve a mixed question of law and fact. *See Juneau County v. Courthouse Employees Local 1312*, 221 Wis. 2d 630, 639, 585 N.W.2d 587 (1998). The determination of what a party knew or should have known is a factual question, and the trial court's findings of fact will not be reversed by an appellate court unless the findings of fact are clearly erroneous. *Id.*; *see* Wis. Stat. § 805.17(2). We examine both express and implied findings of fact, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. *See Shepard v. Outagamie County Circuit Court*, 189 Wis. 2d 279, 286, 525 N.W.2d 764 (Ct. App. 1994). However, the ultimate conclusion of whether the trial court's factual determinations support the legal determination of frivolousness is a question of law which this court determines independent of the trial court, while benefiting from its analysis. *See Juneau County*, 221 Wis. 2d at 639.

¶ 43. The Millsaps contend that, through Wagner, the Briesemeisters knew "from the very moment that the original offer was made" that they would lose all rights to the property if they gave the Lehner group a notice of defects and the Lehner group refused to cure. They further contend that the Briesemeisters knew with certainty on July 19 that their offer was "dead, null

and void" because the Lehner group had accepted another offer. The Lehner group makes similar arguments. None persuade us.

¶ 44. Wayne Briesemeister testified at trial that when he grew uncomfortable with the advice he was getting from Wagner, he contacted Attorney McTernan. McTernan's initial impression was that the Briesemeisters had a "legitimate right to the home." Wayne also testified that he never before had heard the term lis pendens, did not have a good understanding of its function, and filed it and the lawsuit on the advice of his attorney.

¶ 45. The evidence also demonstrated that McTernan, the Briesemeisters' attorney, was a licensed real estate broker before studying law, and that his practice now focuses on business and real estate. After evaluating the Briesemeisters' position, McTernan consulted with another real estate attorney who agreed that McTernan "had an argument" that the contingencies could be waived. McTernan also contacted Staff at WRA who, McTernan said, indicated that he could see McTernan's position and thought the current WB-11 Offer to Purchase forms were unclear as to whether contingencies can be waived after a notice is given. Since the home was part of an estate, McTernan filed a lis pendens so that, should anyone else attempt to purchase the property, it would "put the world on notice" that it was in litigation.

¶ 46. In summary, when the Briesemeisters learned that the deal was at risk, they lost confidence in Wagner's advice and sought a legal opinion that produced some hope that the deal might still be salvaged. This produced an arguable legal theory that the Briesemeisters could validly waive the contingencies, and the lawsuit and the lis pendens were filed accordingly.

Although that theory ultimately proved incorrect, we agree with the trial court that the action was not groundless. The facts do not support a conclusion that the lis pendens was filed with actual or constructive knowledge that it was false, a sham or frivolous. Stated differently, but to the same effect, we cannot say that the Briesemeisters *knew,* or should have, that their attempt to enforce their Offer to Purchase was without any arguable legal basis. Nor can we accept the Millsaps' invitation to declare that the Briesemeisters filed the lawsuit simply to "scare off the rightful purchasers." We conclude that the lawsuit and lis pendens were filed in an honest effort to salvage their deal.

### *Tortious Interference with Contract*

¶ 47. The Lehner group contends the Briesemeisters tortiously interfered with the contract between the Lehner group and the Millsaps. They assert the alleged interference delayed completion of the contract, adding expense and jeopardizing the transaction. While the Briesemeisters' actions undoubtedly interfered with the contract between the other parties, we agree with the trial court that the Briesemeisters' conduct was not unjustified under the facts of this case.

¶ 48. The elements of a claim for tortious interference with a contract are: (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere. *Finch v.*

*Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, ¶ 18 n.8, 274 Wis. 2d 719, 685 N.W.2d 154. The Lehner group asserts that only the fifth prong, whether the Briesemeisters were justified or privileged to interfere, is at issue.

¶ 49. The fifth prong is the decisive one, but we first consider the third one, whether interference by the Briesemeisters was intentional. WISCONSIN JI—CIVIL 2780, "Intentional Interference with Contractual Relationship," addresses each of the five elements of the tort. The question regarding intent asks:

> In determining *(defendant)*'s intent, you may consider (his) (her) actions and statements. Ordinarily, it is reasonable to infer that a person intends the natural and probable consequences of (his) (her) acts.
>
> Although other reasons may appear, *(plaintiff)* must prove that *(defendant)*'s *prime purpose was to interfere with the contractual relationship (plaintiff)* had with *(3rd party)* or *(defendant)* knew or should have known that such interference was substantially certain to occur as a result of the conduct.

WIS JI—CIVIL 2780 (emphasis added).

¶ 50. The Briesemeisters' complaint sought a declaration that the other parties' contract was null and void. Obviously, then, the Briesemeisters' prime purpose was to defeat that contract, which we deem the equivalent of interference with the contract. Interference alone, however, does not establish the tort; in addition, the interference must be improper.[8]

---

[8] Traditionally, courts specified the exceptions to the general rule concerning intentional interference with a contract in

*Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, ¶ 63, 234 Wis. 2d 1, 608 N.W.2d 331. The Briesemeisters bore the burden of proving that their conduct was justified or privileged, *see* WIS JI—CIVIL 2780, in other words, proper.

■

¶ 51. To determine whether conduct is justified or privileged, the trier of fact must weigh all the circumstances. *See id.* The factors to be considered include the nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances. *Id.*

¶ 52. The Briesemeisters look to RESTATEMENT (SECOND) OF TORTS, § 773 (1979), "Asserting Bona Fide Claim," to show that their conduct was fair and reasonable under the circumstances. It provides:

> One who, by asserting in good faith a legally protected interest of his [or her] own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his [or her]

terms of a "privilege" to interfere. *Hale v. Stoughton Hosp. Ass'n, Inc.*, 126 Wis. 2d 267, 281, 376 N.W.2d 89 (Ct. App. 1985), *abrogation on other grounds recognized by Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1405 (7th Cir. 1994). The RESTATEMENT (SECOND) OF TORTS, § 766 (1979), substitutes the concept of "propriety" for privilege, and provides that "one who 'intentionally and improperly' interferes with the performance of a contract is liable." *Hale*, 126 Wis. 2d at 281–82 (citation omitted). We have adopted § 766 of the RESTATEMENT (SECOND) OF TORTS. *Hale*, 126 Wis. 2d at 282.

interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Id.* The Briesemeisters maintain that they honestly believed in their superior right to the property and, in good faith, informed the other parties of their interest and followed through with the legal action necessary to enforce it.

¶ 53. We acknowledge that the trial court stated that it was not convinced that the Briesemeisters had attempted to interfere with the Lehner group-Millsaps contract. But based on the totality of the court's findings and further comments, we interpret the court to say that the Briesemeisters had not *tortiously* interfered with the contract. The court noted that the Briesemeisters sought advice from a "highly reputable firm." The lawyer with whom they met consulted other attorneys, researched Wisconsin statutes, case law and the administrative code, and performed a Westlaw search. It concluded that the Briesemeisters' and McTernan's action, even if misguided, was reasonable and "espoused in good faith."

¶ 54. Accordingly, we read the trial court's decision to mean that the Briesemeisters' actions justified the interference. Although the Briesemeisters later were proved incorrect, they believed at the time that they filed the lawsuit and lis pendens that they had a contractual right to the property. A party has a right to protect what he believes to be his legal interest. *Cudd v. Crownhart*, 122 Wis. 2d 656, 662, 364 N.W.2d 158 (Ct. App. 1985). If that party's position ultimately is demonstrated to be incorrect, liability should not be imposed on that lone factor. *Id.* The Lehner group cites no

other factors. The Briesemeisters and McTernan may have been mistaken, but we cannot say their actions were unjustified.[9]

## CONCLUSION

¶ 55. We hold that the Briesemeisters' decision to deliver notices of defects changed the balance of power such that the contract terminated through the Lehner group's ensuing inaction. The Briesemeisters' two-pronged attempt to revive the contract was to no avail: withdrawing the notices was not permitted by the contract, and waiving the contingencies was irrelevant under these facts. We also hold that, although the Lehner group was not obligated to provide a notice of their intent not to cure the defects, the method they used constituted effective delivery.

¶ 56. As to the cross-appeal, we hold that the filing of the lawsuit and lis pendens was not ill-motivated. The action was commenced in a belief informed by legal research and professional consultation. Although it ultimately was proved wrong, we hold that it was not filed to slander the Millsaps' title or to tortiously interfere with the contract between the Millsaps and the Lehner group. We affirm the appeal and cross-appeal.

*By the Court.*—Judgment affirmed.

■

[9] Because we affirm the dismissal of the slander of title and tortious interference with contract counterclaims, we need not address the Millsaps' other counterclaims relating to standing, damages and attorney fees.