In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1026

FIRST WEBER GROUP, INC.,

*Plaintiff-Appellant,*

*v.*

JONATHAN HORSFALL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 11-cv-506-wmc — **William M. Conley**, *Chief Judge*.

ARGUED SEPTEMBER 12, 2013 — DECIDED DECEMBER 20, 2013

Before WOOD, *Chief Judge*, and MANION and TINDER, *Circuit Judges*.

WOOD, *Chief Judge*. When Jonathan Horsfall collected a commission on a real estate transaction, he opened up a can of worms. His former brokerage firm, First Weber Group, Inc., contends, with the support of a state-court judgment in its favor, that in so doing Horsfall breached legal, contractual, and ethical obligations recognized by Wisconsin law. Horsfall filed for bankruptcy two months after the state

court's decision. In the bankruptcy court, First Weber filed an adversary proceeding in which it contended that Horsfall's judgment debt was excepted from discharge as a debt arising from a "willful and malicious injury." See 11 U.S.C. § 523(a)(6). The bankruptcy and district courts rejected this argument and ruled in Horsfall's favor. We affirm.

**I**

From May 2001 to August 31, 2002, Horsfall worked as a real estate agent for First Weber. During Horsfall's tenure, First Weber executed a form Exclusive Right to Sell contract with one Robert Call, who was trying to sell property at 118 Overlook Terrace in Marshall, Wisconsin (the Call property). The contract gave First Weber exclusive rights to list and collect commissions for sale of the Call property during the listing period, as well as the exclusive right to collect commissions from sales to a defined set of "protected buyers" for one year after the listing period expired. Horsfall was the listing agent for the Call property.

In early August 2002, the Acosta family made an offer on the Call property. Although the deal was not completed, the offer established the Acostas as "protected buyers" according to the terms of the listing contract. Call's contract with First Weber ended on August 28, 2002, but under the protected-buyer clause, First Weber continued to have the exclusive right to collect a commission if the Call property was sold to the Acostas. This right expired one year after the end of the listing period.

Horsfall left First Weber at the end of August 2002 to establish his own brokerage, Picket Fence Realty. In October of that year, the Acostas contacted Horsfall about finding a new

home. Without involving First Weber, Horsfall resuscitated the transaction with Call. On October 8, 2002, the Acostas and Call executed a sales contract for the Call property, using a form furnished by Picket Fence. The transaction closed on October 28, 2002, well within the period protected by First Weber's exclusivity rights. Picket Fence received a $6,000 commission at the closing. This was inconsistent with Horsfall's status as First Weber's agent under the Exclusive Right to Sell contract; it also violated various rules governing Wisconsin real estate practice. The closing documents were conspicuously silent about any interest of First Weber.

Six years later, First Weber sued both Horsfall and Call in Wisconsin state court. Call assigned his interest in the suit to First Weber, which dismissed him from the action (undoubtedly because Call's debts had been discharged in bankruptcy during the intervening years). Against Horsfall, First Weber asserted claims for breach of contract, tortious interference, and unjust enrichment. The state court granted summary judgment in favor of First Weber on all claims. In delivering its opinion, the court stated that Horsfall had "converted" funds owed to First Weber, but it did not elaborate on that comment. On January 28, 2010, the court entered a judgment against Horsfall in the amount of $10,978.91.

Horsfall filed for Chapter 7 bankruptcy on April 5, 2010, listing First Weber as a creditor. First Weber responded with a claim that its judgment debt was non-dischargeable under 11 U.S.C. § 523(a)(6), which excepts from discharge debts stemming from "willful and malicious injury" caused by the debtor. First Weber urged that the state court judgment conclusively established, by way of issue preclusion, all of the

elements necessary to satisfy § 523(a)(6). The bankruptcy court denied summary judgment and set the case for trial.

After hearing the evidence at trial, the bankruptcy court concluded that Horsfall never harbored animosity toward First Weber and that he believed that his obligations to First Weber had ended as of August 28, 2002, when the agency agreement and Call's listing contract expired. The court was less charitable to Call: it did not credit his story that he thought his obligations to First Weber ended with the expiration of the listing agreement. The court excluded some evidence offered by First Weber, including proffered expert testimony by an attorney (Rick Staff), information about Horsfall's membership in a realtors' association and multiple listing service, and impeachment evidence indicating that Horsfall had made misstatements in court submissions. Ultimately, the bankruptcy court held that First Weber "did not demonstrate that the cause of [its] claim was an injury … much less that it was willful or malicious." The district court affirmed, and this appeal followed.

**II**

First Weber makes three arguments on appeal: first, it asserts that the bankruptcy and district courts erred in refusing to find issue preclusion based on the state court judgment; second, it contends that it was entitled to summary judgment on its claim that the debt arose from a willful and malicious injury; and third, it urges that the bankruptcy court abused its discretion in excluding some of First Weber's evidence. Horsfall views this entire appeal as frivolous and worthy of sanctions. First Weber retorts that Horsfall's frivolousness argument is itself frivolous. We begin with issue

preclusion, because that is the centerpiece of First Weber's position.

A. Issue Preclusion

A state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court. *Allen v. McCurry*, 449 U.S. 90, 96 (1980); see 28 U.S.C. § 1738. This rule applies with equal force to bankruptcy cases. *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987). We review determinations of the preclusive effect of state law *de novo. In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011) (bankruptcy appeal); *Donald v. Polk Cnty.*, 836 F.2d 376, 382–83 (7th Cir. 1988) (applying Wisconsin law).

Under Wisconsin law, "[c]ollateral estoppel, or issue preclusion, is a doctrine designed to limit the relitigation of issues that have been contested in a previous action between the same or different parties." *Michelle T. by Sumpter v. Crozier*, 495 N.W.2d 327, 329 (Wis. 1993). Wisconsin courts apply the following general rule: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Hlavinka v. Blunt, Ellis & Loewi, Inc.*, 497 N.W.2d 756, 762 (Wis. Ct. App. 1993) (quoting Restatement (Second) of Judgments § 27 (1980)).

In Wisconsin (as in most states), the question whether issue preclusion applies depends on two criteria. The first (the "actually litigated step") requires that "the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and [have been] necessary

to the judgment." *Mrozek v. Intra Fin. Corp.*, 699 N.W.2d 54, 61 (Wis. 2005). The second (the "fundamental fairness step") requires the court to "determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Id.* Relevant factors for the latter inquiry include the availability of review of the first judgment, differences in the quality or extensiveness of the proceedings, shifts in the burden of persuasion, and the adequacy of the loser's incentive to obtain a full and fair adjudication of the issue. *Id.* at 61–62. The fundamental fairness step eschews formalistic requirements in favor of "a looser, equities-based interpretation of the doctrine." *Michelle T.*, 495 N.W.2d at 330.

In order to know what was "actually litigated," we must take a closer look at what the state court decided. The parties agree that First Weber's complaint in state court put forth only three theories of recovery: breach of contract, tortious interference, and unjust enrichment. Notably, the pleadings did not raise a claim for conversion, but First Weber's motion for summary judgment included that theory as a fourth basis for recovery. There are hints that the state court was aware that conversion was at issue: it did not undertake a detailed analysis of a conversion claim, but the transcript reflects that the court twice said that Horsfall "converted" money belonging to First Weber. Although this is a thin reed, we will assume for present purposes that the state court did make a finding of liability on a conversion claim.

This is important for First Weber's position in the bankruptcy case because, of the four theories it raised in the state court, only the intentional torts of interference and conversion could plausibly constitute willful and malicious injury.

In order to find liability on the tortious interference claim, the state court had to find: (1) First Weber had a contract with a third party; (2) Horsfall interfered with that contract; (3) Horsfall's interference was intentional; (4) the interference caused First Weber damages; and (5) Horsfall was not justified or privileged to interfere. See *Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006). For the conversion claim, the court had to find: (1) intentional control or taking of property belonging to First Weber; (2) without First Weber's consent; which (3) resulted in serious interference with First Weber's right to possess the property. See *H.A. Friend & Co. v. Prof. Stationery, Inc.*, 720 N.W.2d 96, 100 (Wis. Ct. App. 2006); *Methodist Manor of Waukesha, Inc. v. Martin*, 647 N.W.2d 409, 412 (Wis. Ct. App. 2002) ("[M]oney may also be converted.").

The question for us is what effect these findings have on the bankruptcy issue of non-dischargeability for willful and malicious injury under 11 U.S.C. § 523(a)(6). See *Bukowski v. Patel*, 266 B.R. 838 (E.D. Wis. 2001) (applying Wisconsin issue preclusion in inquiry regarding willful and malicious injury). The bankruptcy and district courts concluded that the state judgment had no effect on the bankruptcy inquiry because the state court did not find—and was not required to find—willful and malicious injury as that term is used in the Bankruptcy Code. If that were all we had, we would find that analysis to be insufficient, because issue preclusion could apply to the elements of the willful and malicious inquiry even if the state court was addressing a different ultimate question. See *Klingman*, 831 F.2d at 1295 ("Where a state court determines factual questions using the same standards as the bankruptcy court would use, collateral estoppel should be applied[.]").

In order to compare the essential state-court findings with the requirements for willful and malicious injury, we need a better understanding of the latter term. Unfortunately, the case law is "all over the lot" when it comes to defining it. See *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (recounting similar but different tests from the Second, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits). Bankruptcy courts in this circuit have focused on three points: (1) an injury caused by the debtor (2) willfully and (3) maliciously. *In re Carlson*, 224 B.R. 659, 662 (Bankr. N.D. Ill. 1998), *aff'd* 2000 WL 226706 (N.D. Ill. 2000), *aff'd* 2001 WL 1313652 (7th Cir. 2001). As with all exceptions to discharge, the burden is on the creditor to establish these facts by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Looking more closely at these three elements—injury, willfulness, and malice—a few points are worth making. The term "injury," while not defined in the Code, is understood to mean a "violation of another's legal right, for which the law provides a remedy." *In re Lymberopoulos*, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011) (citation omitted). The injury need not have been suffered directly by the creditor asserting the claim. *Larsen v. Jendusa-Nicolai*, 442 B.R. 905, 917 (E.D. Wis. 2010), *aff'd* 677 F.3d 320 (7th Cir. 2012). The creditor's claim must, however, derive from the other's injury.

Willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). Although *Geiger* refers to intentional torts to help explain the federal standard, it does not hold that all state-law intentional torts are "willful" for purposes of section

523(a)(6). See *Jendusa-Nicolai*, 677 F.3d at 322 ("[A]n intentional tort needn't involve an intent to cause injury."). "Willfulness" can be found either if the "debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." See *Bukowski*, 266 B.R. at 844 (noting substantially similar standards for willfulness in the Fifth, Sixth, Eighth, and Ninth Circuits).

Lastly there is maliciousness, which requires that the debtor acted "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (citation omitted). We recently commented that we had not had the occasion to revisit the *Thirtyacre* definition since the Supreme Court's decision in *Geiger*. See *Jendusa-Nicolai*, 677 F.3d at 323. Understanding that the definition of willfulness must incorporate *Geiger*'s admonition that the requisite intent for purposes of § 523(a)(6) is the intent to injure rather than the intent to act, we reaffirm today that our definition of maliciousness from *Thirtyacre* remains good law. See *id.* at 323 (noting substantially similar definitions of maliciousness in the Second, Sixth, Ninth, and Eleventh Circuits).

Returning to the present case, we conclude that the bankruptcy and district courts erred in failing to apply issue preclusion to the first and third elements of the § 523(a)(6) inquiry (injury and maliciousness). The state court necessarily and actually found injury on each intentional tort claim. The tortious interference claim rested on the finding that Horsfall's interference caused First Weber damages. See *Briesemeister*, 720 N.W.2d at 542. Similarly, the conversion claim required the finding that Horsfall's taking of property

resulted in serious interference with First Weber's rights. See *H.A. Friend & Co.*, 720 N.W.2d at 100. Because injury was a required element of the claims, the state court's injury findings were actually litigated and necessary to the judgment. *Mrozek*, 699 N.W.2d at 61. We also find nothing fundamentally unfair in holding Horsfall to the state court's decision on injury.

The state court judgment also precluded relitigation of the issue of maliciousness. For purposes of section 523(a)(6), maliciousness exists when one acts in "conscious disregard of one's duties or without just cause or excuse." *Thirtyacre*, 36 F.3d at 700. First Weber's state-law tortious interference claim required a finding that Horsfall was "not justified or privileged to interfere" with its contractual rights. *Briesemeister*, 720 N.W.2d at 542. The state court thus determined that Horsfall's interference was intentional and that he was neither justified nor privileged to interfere with First Weber's rights. In order to reach this conclusion, the state court had to find that Horsfall's actions were not reasonable or taken in good faith. This inquiry substantially mirrored the federal test for maliciousness. As before, there is nothing fundamentally unfair about holding Horsfall to this finding.

Only one element of the § 523(a)(6) inquiry remains between First Weber and the result it wants: willfulness, meaning either a motive to inflict injury or an act substantially certain to result in injury. The first element of conversion requires "intentional control or taking of property belonging to another;" the third element of tortious interference requires that the interference was intentional. Both of these necessarily require only intent to act, not intent to injure. *Cf.*

*Geiger*, 523 U.S. at 61 (requiring for § 523(a)(6) purposes a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury") (emphasis removed). Neither of the state-law claims requires showing intent to injure, and thus that finding was not necessary to the state court's judgment.

If accepted, First Weber's position would risk transforming every state-law intentional tort into a non-dischargeable debt, contrary to the Supreme Court's opinion in *Geiger*. That problem, added to "the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start,'" see *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994), leads us to conclude that the state court's decision did not preclude Horsfall from litigating the issue of willfulness in the bankruptcy case.

### B. Summary Judgment

We now turn to First Weber's contention that it was entitled to summary judgment, in light of issue preclusion, the undisputed facts, or some combination of the two. This argument runs into a procedural roadblock: it overlooks the fact that after the bankruptcy court denied summary judgment under Bankruptcy Rule 7056, it went on and held a full trial. We have held, when speaking of the district courts, that the refusal to grant summary judgment is not normally reviewable by this court if a full trial on the merits then takes place. See, *e.g.*, *Eastern Natural Gas Corp. v. Aluminum Co. of Amer.*, 126 F.3d 996, 1002 (7th Cir. 1997). The legal sufficiency of the evidence presented at a jury trial must be tested by a timely motion under Federal Rule of Civil Procedure 50, or in the case of a bankruptcy trial, Federal Rule of Bankruptcy Procedure 9015(c). (Rule 9015(c) provides that "Rule 50 F.R.

Civ. P. applies in cases and proceedings [in bankruptcy court], except that any renewed motion for judgment or request for a new trial shall be filed no later than 14 days after the entry of judgment.") This trial was to the court, and thus the procedures of Bankruptcy Rule 7052 (the analogue to Federal Rule of Civil Procedure 52) applied. But the basic point of the *Eastern Gas* line of cases is that the function of a summary judgment motion is exhausted once the trial starts. Whether it is a trial to a jury or a trial to the court, there are alternative and more appropriate ways to assert that the evidence is legally insufficient once a full trial record has been compiled.

We are satisfied here, however, that First Weber has preserved its ability to argue for judgment as a matter of law. Very few facts were disputed, and the bankruptcy judge made it clear that First Weber's counsel should not keep harping on its right to judgment, given the court's adverse rulings. We therefore move to the merits of First Weber's argument: that it should have been granted judgment as a matter of law based on some combination of issue preclusion and the undisputed facts.

C.  Judgment at Trial

We apply the same standards of review as the district court in reviewing the bankruptcy court's decision. *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009). We apply *de novo* review for the bankruptcy court's conclusions of law and clear error review for its findings of fact. FED. R. BANKR. P. 7052; see *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008).

The question whether an actor behaved willfully and maliciously is one of fact. *Thirtyacre*, 36 F.3d at 700. "When there

are two permissible views of the evidence, the [court]'s choice between them cannot be clearly erroneous." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010). We must be especially deferential toward a trial court's assessment of witness credibility. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

At trial, Horsfall and Call each testified. The bankruptcy court found that Horsfall "credibly testified that he has never had any ill-will or animosity towards First Weber … [and that he] believed his duties and obligations to First Weber under both the agent agreement and under Call's listing contracts were terminated when the contracts themselves were cancelled or expired." In contrast, the bankruptcy court "doubt[ed] the veracity" of Call's testimony that Horsfall "induced him [Call] to expire his listings [*sic*] with First Weber and list his properties to Picket Fence." The court found Call's "claimed ignorance of the one-year exclusion period and the nature of protected buyers incredible in light of Call's business and real estate experience."

The facts that the court credited support its conclusions that Horsfall did not intend to injure First Weber and that injury to First Weber was not substantially certain to occur. Horsfall could not have intended to injure First Weber if Horsfall did not even realize that the prior agreements remained in force. Furthermore, even if he had known the agreements remained in force, Horsfall's collection of a commission from Call did nothing formally to change Call's liability to First Weber. Whether he knew it or not, Call remained liable to First Weber on the Exclusive Right to Sell contract. That is undoubtedly why First Weber originally sued both Horsfall and Call in state court. As it happened,

Call's debt to First Weber was discharged in Call's own bankruptcy, but that is not Horsfall's fault. First Weber acknowledges as much in its brief before this court.

Because Horsfall's actions did not have the effect of extinguishing Call's debt to First Weber, injury flowing from those actions was not substantially certain to occur. Horsfall's unethical collection of an additional commission, while not to be commended, did not affect First Weber's legal rights against Call. If First Weber had collected from Call, then perhaps Call would have had a claim for willful and malicious injury against Horsfall. But Call did not assert any claims in Horsfall's bankruptcy, and First Weber's injury was not derivative of any loss to Call. Moreover, the bankruptcy court found that Call knew he remained liable to First Weber. First Weber could have collected from Call despite Horsfall's actions, and so its injury was not certain.

We find no clear error in the bankruptcy court's findings. First Weber has pointed to no evidence that would justify our setting aside the court's credibility determinations. Although First Weber spends a great deal of time arguing that the court erred in finding that Horsfall was entitled to a commission on the Call sale, that Horsfall listed the Call property after leaving First Weber, and that Horsfall could have acted as a dual agent for both Call and the Acostas, none of these points is relevant to the question whether Horsfall intentionally injured First Weber or whether First Weber's injury was substantially certain to occur.

Ultimately, First Weber, supported by the Wisconsin Realtors Association as *amicus curiae*, contends that the brokerage was certain to suffer injury simply because Horsfall breached numerous legal and ethical obligations under Wis-

consin real estate law and ignored First Weber's exclusive right to collect a commission from sale of the Call property to the Acostas. The hole in that argument is that Call remained fully liable for all commission debts owing to First Weber. Although First Weber was entitled to schedule its contractual claims against Horsfall in the bankruptcy court, it failed to show that those claims should be excepted from the normal power of the court to discharge debts.

### D. Evidentiary Rulings

In this part of its appeal, First Weber argues that various evidentiary rulings so prejudiced it that a new trial is necessary. In particular, it takes issue with the bankruptcy court's exclusion of three pieces of evidence: (1) attorney Staff's expert testimony regarding Wisconsin real estate law and ethical rules; (2) evidence of Horsfall's memberships in the National Realtors Association and the multiple listing service; and (3) impeachment evidence suggesting that Horsfall made misstatements in filings with the court. To challenge the bankruptcy court's exclusion of this evidence, First Weber must show that the court abused its discretion. *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994).

First Weber tells us that Staff's testimony was offered to "articulat[e] and expl[ain] brokerage practices, including both education and application to the contracts and transactional issues raised." The bankruptcy court did not question Staff's credentials, but it excluded his testimony as unhelpful and irrelevant. See FED. R. EVID. 702. We see no abuse of discretion in that judgment. A court does not need an expert to explain an area of law. In addition, Staff's proposed testimony was irrelevant because it showed only that Horsfall intentionally broke Wisconsin real estate rules ("intent to act"); it

had no bearing on whether he intended to inflict injury on First Weber.

The court similarly acted within bounds when it decided to exclude the proposed evidence of Horsfall's membership in the National Realtors Association and the multiple listing service. First Weber offered this to show that Horsfall was subject to various legal and ethical obligations. But as we already have noted, that was beside the point. Indeed, that Horsfall breached an array of obligations was not in dispute, nor could it have been, in light of the state court's decision. The matter in dispute was whether Horsfall intended to injure First Weber or if injury was substantially certain to occur. Horsfall's association memberships say little or nothing about that. It was not an abuse of discretion to exclude this evidence.

Finally, First Weber offered evidence of misstatements in court filings in order to show that Horsfall's testimony was unreliable. The bankruptcy court ruled that such "general impeachment" was not relevant to the central issue in the case. Federal Rule of Evidence 608(b) provides that "the court may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of … the witness." The rule is permissive, not mandatory, leaving the court with great discretion. The bankruptcy court determined that Horsfall's alleged misstatements on ancillary issues were not sufficiently probative of his truthfulness regarding material issues to warrant their admission. This strikes us as a closer call, but standards of review matter. First Weber has not carried its burden to show that the court abused its discretion, or even that this error was prejudicial.

In short, we find no abuse of discretion in the challenged evidentiary rulings, and so we reject First Weber's request for a new trial on this basis.

E. Cross-Motions for Sanctions

Finally, we turn to the parties' cross-motions for sanctions. We regard an appeal as frivolous "when the result is foreordained by the lack of substance to the appellant's argument." *Matter of Generes*, 69 F.3d 821, 828 (7th Cir. 1995) (internal quotation omitted). It is important to keep the bar high, so that parties will not be dissuaded from bringing arguments that ultimately may fail, but that are fair grounds for application or extension of the law. With that in mind, we see no ground for sanctions against either party here.

This case involves the interplay of some knotty areas of law, including issue preclusion and bankruptcy. Our own analysis of the preclusion question differs from that of both courts below. Furthermore, as we noted, decisions have been "all over the lot" with respect to the definition of willful and malicious injury for purposes of § 523(a)(6). The result here was not foreordained, and so there is no reason to sanction First Weber for filing the appeal. Nor do we think Horsfall should be sanctioned, since he was entitled to rely on the bankruptcy court's findings of fact and the distinctions between the earlier state proceeding and the present case.

We take this opportunity to caution the parties and the bar that they should not lightly label their opponents' arguments as frivolous. As our sister circuit said recently:

> There are good reasons not to call an opponent's arguments "ridiculous" … . The reasons include civility; the near-certainty that over-

statement will only push the reader away …; and that, even where the record supports an extreme modifier, the better practice is usually to lay out the facts and let the court reach its own conclusions.

*Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 584–85 (6th Cir. 2013) (internal quotation omitted). We think the parties in this case would have done well to follow this advice.

************

The judgment of the district court is

AFFIRMED.