# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2384

JAY PRESTON,

*Plaintiff-Appellant*,

v.

WISCONSIN HEALTH FUND, BRUCE TROJAK,
and LINDA HAMILTON,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-0448—**Patricia J. Gorence**, *Magistrate Judge*.

_____

ARGUED JANUARY 11, 2005—DECIDED FEBRUARY 9, 2005

_____


Before POSNER, MANION, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. Jay Preston, a dentist, charges that the Wisconsin Health Fund, his former employer, discriminated against him on account of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, when they replaced him as director of the Fund's dental clinic with Linda Hamilton (not to be confused with the female lead in the first two *Terminator* movies). Preston further argues that in procuring this substitution, Bruce Trojak, the Fund's chief executive officer, conspired with Hamilton to destroy Preston's contractual relationship with the Fund, in violation of Wisconsin's common law of

tortious interference with contract. The district court granted summary judgment for the defendants.

The Fund is a teamsters health and welfare fund that provides health services directly in clinics that it owns, as well as indirectly by paying for medical or dental treatment that its participants obtain outside the Fund's clinics. The Fund had been hemorrhaging money for many years when Trojak became its chief executive officer in 1998. The dental clinic alone, under Preston, its long-time director, lost $1 million the following year. Preston presented ideas for stemming the flow to Trojak in a well-written business plan (Preston has an M.B.A. as well as a dental degree), despite which Trojak fired him and replaced him with Hamilton, a much younger dentist who had no apparent credentials for the job except eagerness for it. Trojak testified at his deposition that Preston's ideas were too few and too late and that he was impressed by Hamilton's "can do" attitude. This may be true but it may also be true, as Preston claims, that Trojak favored Hamilton for personal reasons. There were rumors, although unsubstantiated, that they were having an affair. They frequently dined together and sometimes after dinner would repair to his apartment for—according to their not terribly credible deposition testimony—platonic sessions solely devoted to disinterested discussion of the future of the dental clinic, though Hamilton did acknowledge indicating at these sessions her desire to be promoted to dental director.

Trojak is no longer with the Fund, and Hamilton is no longer the dental director. But the circumstances of their departures are obscure, and both are represented in this lawsuit by the Fund's law firm.

A male executive's romantically motivated favoritism toward a female subordinate is not sex discrimination even when it disadvantages a male competitor of the woman. Such favoritism is not based on a belief that women

are better workers, or otherwise deserve to be treated better, than men; indeed, it is entirely consistent with the opposite opinion. The effect on the composition of the workplace is likely to be nil, especially since the disadvantaged competitor is as likely to be another woman as a man—were Preston a woman, Trojak would still have fired her to make way for Hamilton unless Trojak was romantically entangled with both of them. Neither in purpose nor in consequence can favoritism resulting from a personal relationship be equated to sex discrimination. *Schobert v. Illinois Dept. of Transportation*, 304 F.3d 725, 733 (7th Cir. 2002); *Womack v. Runyon*, 147 F.3d 1298 (11th Cir. 1998) (per curiam); *Becerra v. Dalton*, 94 F.3d 145, 149-50 (4th Cir. 1996); *DeCintio v. Westchester County Medical Center*, 807 F.2d 304, 308 (2d Cir. 1986).

Preston tries to bolster his case by pointing to the fact that Trojak gave large raises to several women and by noting that there was even talk in the workplace of "Bruce and his harem." But he provides no details that would enable a trier of fact to infer that the raises were motivated by the recipients' sex. All we know is the amount of the raises, the number of recipients, and the sex ratio of the recipients—five women to two men. To infer discrimination we would need to know more. We would need to know the sex composition of the Fund's workforce, whether there were men who had jobs comparable to those of the five women but didn't get similar raises, and whether the raises were due to the women's being promoted to new jobs and if so whether men had a fair opportunity to compete for those promotions. There are some answers in the record but Preston makes nothing of them. He insists that the bare fact that more women than men got large raises, together with the favoritism shown Linda Hamilton, is enough to get him to a jury.

One reason it is not enough is that the courts take a realistic view of the circumstances in which an inference that men are discriminating in favor of rather than against women is plausible. *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003); *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999); *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). It is not surprising when women discriminate in favor of women any more than it is surprising men discriminate in favor of men. It *is* surprising, in many though not all cases, when men discriminate against men in favor of women. Two situations that have been identified in the cases where it is not surprising. The first is where the men running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in "diversity" to increase the proportion of women in the company's workforce. *Hill v. Ross*, 183 F.3d 586 (7th Cir. 1999); *Wheeler v. Missouri Highway & Transportation Comm'n*, 348 F.3d 744, 749 (8th Cir. 2003); *Brunet v. City of Columbus*, 1 F.3d 390 (6th Cir. 1993). The second situation is where the jobs in question are traditional "women's work," such as nursing, which the men running the company believe women can do better than men; fixated on this stereotype they refuse to make an individualized assessment of male applicants. *Lynn v. Deaconess Medical Center-West Campus*, 160 F.3d 484 (8th Cir. 1998); *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971); cf. *Mississippi University for Women v. Hogan*, 458 U.S. 718, 720-21 (1982).

There may be other situations as well in which it is plausible to expect that men might discriminate against men and in favor of women; the list is not a closed one. See *Phelan v. City of Chicago, supra*, 347 F.3d at 684-85; *Mills v. Health Care Service Corp., supra*, 171 F.3d at 456-57. But when

as in this case no reason is given why men might be expected to discriminate against men, the plaintiff, to raise a triable issue of discrimination, must present some evidence beyond the bare fact that a woman got a job that a man wanted to get or keep. A gross disparity in qualifications might be such evidence—but for the fact in this case that the plaintiff himself is insisting that the reason the less-qualified Hamilton was given the job of the more-qualified Preston was personal and, as we have explained, unrelated to sex discrimination. All that is left is the undeveloped evidence of the raises given to the other women. The district judge was correct, therefore, to grant summary judgment for the Fund on Preston's Title VII claim.

Let us move on to the tort claim. Preston's lawyer suggested at argument that by joining it to a Title VII claim he had the defendants in a fork. If we thought that Trojak advanced Hamilton for purely romantic reasons, this would, he conceded, undermine his Title VII claim for the reason that we have just explained. But he insisted that it would make his tortious-interference case by showing that Trojak and Hamilton had ruptured Preston's contractual relationship with the Fund without justification.

In the typical tortious-interference case, *A* has a contract with *B*—for example, to sing in an opera produced by *B*—and *C* comes along and induces *A* to break her contract and sing for *C*'s opera company instead. *B* can sue *A* for breach of contract, but *B* can also sue *C* in tort for inducing the breach. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 539 (7th Cir. 1998); *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (Q.B. 1853); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129, p. 980 (5th ed. 1984); *Restatement (Second) of Torts* § 766 (1979). The present case is unusual because *C* is, as it were, another singer,

trying to take *A*'s place. It is not as if Trojak-Hamilton, viewed as a pair who conspired to replace Preston with Hamilton, were competitors of the Fund seeking to steal Preston from it. They were employees of the Fund seeking to get rid of a competing employee. The struggle is internal to the employer, which will find it hard to control its employees if they can sue each other—and especially if they can sue the Fund's CEO—over promotions and demotions. If Preston's tortious-interference claim can fly, it means that whenever a supervisor decides to promote one person in place of another, the person who doesn't get the promotion will be able to sue him. An employer's costs will rise if he must compensate his supervisors for the risk of their being sued by employees whom they fire—that, or the supervisors will be timid about firing nonperforming employees, an arguable characterization of Preston.

Granted, what was a promotion for Hamilton was not a lost promotion for Preston; it was the loss of his job. But he was an employee at will. That means the Fund didn't want him to have a right to sue it for breach of contract if it fired him. Not that there can never be a suit for tortious interference with contract by an employee at will. Employment at will is a contractual relationship, albeit one with no definite duration; if for example some competing dental clinic had slandered Preston to the Fund in order to get him fired in the hope of being able to hire him for itself at a lower wage, he would have a solid claim against the clinic for tortious interference. *Mendelson v. Blatz Brewing Co.*, 101 N.W.2d 805, 807 (Wis. 1960); *Mackenzie v. Miller Brewing Co.*, 608 N.W.2d 331, 349 (Wis. App. 2000); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). But that would not be like this case. The practical effect of a suit against a coworker or a corporate officer might be to transform employment at will into employment terminable

only for cause.

The cases do not rule out all possibility of an at-will employee's bringing a suit for tortious interference against a corporate officer, such as Trojak. *Mendelson* and *Mackenzie* were such cases; see also *Lorenz v. Dreske*, 214 N.W.2d 753, 760 (Wis. 1974); *Joseph P. Caulfield & Associates, Inc. v. Litho Productions, Inc.*, 155 F.3d 883, 890 (7th Cir. 1998) (Wisconsin law); *Farr v. Gruber*, 950 F.2d 399, 402 (7th Cir. 1991) (ditto); *Kumpf v. Steinhaus*, 779 F.2d 1323, 1325 (7th Cir. 1985) (ditto). But to avoid converting employment at will into employment terminable only for cause, the cases require the plaintiff to prove that the defendant had an improper motive. Mark R. Hinkston, "Tortious Interference with At-Will Employment," *Wisconsin Lawyer*, Sept. 2001, pp. 14, 16-17, 54, 56 (Sept. 2001). As we noted in *Farr*, the cases are unclear on what should count as such a motive. See, e.g., *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 270 (7th Cir. 1995) (Wisconsin law); *Albert v. Loksen*, 239 F.3d 256, 275-76 (2d Cir. 2001); *Daley v. Aetna Life & Casualty Co.*, 734 A.2d 112, 134-36 (Conn. 1999); *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878-79 (Ill. 1991). But unless courts are to be overwhelmed by suits by disgruntled former employees against corporate officers, more is required than that a discharge be tainted by some private motive, such as greed, personal dislike, or, in this case perhaps, a personal attachment to a competing employee. Few are the employees whose actions are motivated solely by a selfless devotion to the employer's interests. The plaintiff must prove both that the employer did not benefit from the defendant's act and that the act was independently tortious, for example as fraud or defamation.

Preston has made no effort to satisfy either requirement: With the dental clinic that he had long managed operating at a large deficit, as was the Fund as a whole, the trustees undoubtedly expected their new CEO to wield the axe. There is no evidence that they regretted Preston's discharge

or Hamilton's replacing him or made any effort to reemploy Preston—a natural step to have taken had they thought it a mistake (or worse) to fire him. They ratified Preston's discharge. There is also no evidence that Trojak and Hamilton defamed or defrauded Preston or otherwise committed an independent tort against him (that is, a tort different from the tort of intentional interference with a contract) in procuring his discharge and replacement by Hamilton. A jury would be speculating if it found that Trojak would not have appointed Hamilton to head the dental clinic had he not had romantic feelings toward her. Trojak and Hamilton may not have been acting *solely* in the interests of the Fund, but that is too demanding a test.

AFFIRMED.

A true Copy:

     Teste:

                                           _____

                                          *Clerk of the United States Court of*
                                           *Appeals for the Seventh Circuit*