In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3870

STEPHEN D. WESBROOK, PH.D.,

*Plaintiff-Appellant,*

*v.*

KARL J. ULRICH, M.D., and EDWARD A. BELONGIA, M.D.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 13-cv-494-wmc — **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 8, 2016 — DECIDED OCTOBER 20, 2016

Before WOOD, *Chief Judge*, and KANNE and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents issues under Wisconsin law on the scope of tort remedies a fired at-will employee might have not against his employer but against individual supervisors and co-workers. Plaintiff Dr. Stephen Wesbrook, a former employee of the Marshfield Clinic Research Foundation, brought this lawsuit against Dr. Edward

Belongia, a former colleague, and Dr. Karl Ulrich, the chief executive officer of the Marshfield Clinic. Wesbrook contends that Belongia and Ulrich tortiously interfered with his at-will employment, engineering his termination by publishing defamatory statements about him to the Marshfield Clinic board of directors.

The district court granted summary judgment to the defendants. Wesbrook has appealed. Wisconsin tort law governs this case, which is within the federal courts' diversity jurisdiction under 28 U.S.C. § 1332. The undisputed facts show that the defendants' statements about the plaintiff were true or substantially true and therefore privileged. Under Wisconsin law, an at-will employee cannot recover from former co-workers and supervisors for tortious interference on the basis of their substantially truthful statements made within the enterprise, no matter the motives underlying those statements. We therefore affirm the judgment of the district court.

I.   *Factual and Procedural Background*

We review *de novo* the district court's grant of summary judgment to the defendants. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 462 (7th Cir. 2016). To prevail on summary judgment, the defendants must show that there is no "genuine dispute as to any material fact" and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Like the district court, we must construe all evidence and draw all reasonable inferences in favor of the non-moving party, plaintiff Wesbrook. See *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015).

A. *The Parties*

This case arises from strategic disagreements and a power struggle within the Marshfield Clinic, a prominent not-for-profit health care system headquartered in Marshfield, Wisconsin. At all relevant times, defendant Ulrich served as president and chief executive officer of the Clinic and as a member of its board of directors. One of the Clinic's divisions is the Marshfield Clinic Research Foundation ("the Research Foundation"), which is the largest private medical research institute in Wisconsin. During the years in question, Dr. Humberto Vidaillet served as director of the Research Foundation. Plaintiff Wesbrook was deputy director from 2006 until his termination took effect January 2, 2012. Defendant Belongia was also employed at the Research Foundation as a senior research scientist and research center director.

B. *Conflict at the Research Foundation*

Proceedings in the district court narrowed Wesbrook's allegations against Ulrich and Belongia to a claim for tortious interference with his employment based on four statements that Ulrich published to the Clinic's board of directors: (1) Wesbrook coerced Research Foundation employees he supervised; (2) some Research Foundation employees filed complaints against Wesbrook; (3) Wesbrook breached a performance improvement plan; and (4) a prominent supporter of the Clinic spoke with over forty people associated with the Clinic and the Research Foundation, many of whom complained about Wesbrook. As explained below, each of these statements was substantially true, but some further factual background is needed to understand this litigation and the implications of the parties' legal positions.

Wesbrook's tenure as deputy director of the Research Foundation was marked by internal conflict. Problems first surfaced during his candidacy for the deputy position. One member of the interview committee remarked: "I would be reluctant to hire someone who has so clearly and dramatically polarized the basic scientists that constitute the 'core' of the research organization." (Wesbrook was then already known to the committee; he had worked at the Research Foundation previously, from 2000 to 2005.) Another employee threatened to resign if Wesbrook were rehired and followed through on that threat shortly after Wesbrook returned.

Though Wesbrook had a good working relationship with his immediate supervisor, Vidaillet, his relationship with Ulrich was stormy. Ulrich wanted to change the Clinic's organizational structure. On several occasions between May 2008 and September 2011, Ulrich tried but failed to reduce the independence of the Research Foundation's board of trustees and to transfer oversight of the Research Foundation's endowment to the Clinic's executive leadership. Collaborating with Vidaillet and the Research Foundation's trustees, Wesbrook helped defeat these efforts.

In July 2008, Ulrich also circulated a shareholder proposal to switch the Clinic from its democratic, physician-led governance structure to a more conventional corporate model. According to Vidaillet, the proposal would have resulted in Ulrich's automatic selection as interim CEO, a position that would have given him substantial influence over appointments of new board members. Vidaillet vigorously opposed Ulrich's plan, and he recruited Wesbrook to help his campaign

against it. Ulrich's proposal was defeated, as were similar proposals in 2009 and 2011.[1]

C. *Employee Complaints*

The undisputed evidence also shows conflict and tension within the Research Foundation where Wesbrook was deputy director. In March 2010, an employee alerted David Keefe, director of human resources, that Wesbrook and Vidaillet had been making derogatory comments about Research Foundation scientists, prompting some of them to resign. Then another employee alerted the Research Foundation's board of trustees that fifteen scientists had left the foundation since 2006. On April 13, 2010, the Clinic's board of directors asked the human resources department to investigate why the fifteen scientists had left and whether there was a "culture of intimidation" at the Research Foundation.

Keefe investigated. He spoke with nine of the fifteen scientists who had left the Research Foundation. In response to

---

[1] As a third example of his conflict with Ulrich, Wesbrook points to his and Vidaillet's efforts in the fall of 2011 to persuade the Clinic's board of directors to investigate possible Medicare fraud in relation to a contract that Ulrich had executed. The board declined to undertake the investigation. While Wesbrook refers to himself in this lawsuit as a "whistleblower," there is no indication that he took his concerns outside the Clinic organization. Nevertheless, Wesbrook argues that Ulrich had it out for him after he "assisted in bring[ing] possible violations of law to the Board's attention." We are not so convinced. As the district court noted, "Wesbrook fails to tie this event to any alleged motive on the part of Ulrich to seek his termination. Specifically, Wesbrook fails to point to evidence that Ulrich opposed the investigation." *Wesbrook v. Ulrich*, No. 13-cv-494-wmc, 2015 WL 7871063, at *3 n.6 (W.D. Wis. Dec. 3, 2015). This appeal presents no issue concerning the legal rights of genuine whistleblowers.

open-ended questions, several described Wesbrook's management style using words such as "cold, militaristic, harsh, retaliatory, abusive, negative, hostile, confrontational, out of control, threatening, boot-camp-like, and contentious." While Keefe was investigating, other employees brought additional concerns to Ulrich's attention. One research scientist told Ulrich that Wesbrook's management style was "oppressive" and that he "retaliated against scientists who questioned or disagreed with his decisions." Another scientist described Wesbrook as "intimidating and vindictive" and blamed Wesbrook for creating a "toxic" environment. An emeritus research clinician told Ulrich that employees found Wesbrook "intimidating and demeaning" and that they "feared retribution if they said anything that was contrary" to Wesbrook.

Ulrich scheduled a meeting with Wesbrook for September 2, 2010. He planned to address Wesbrook's management style and the possible consequences of his behavior. On the morning of the scheduled meeting, Ulrich notified Vidaillet (Wesbrook's immediate supervisor) about his intentions for the meeting. Vidaillet then told Wesbrook to take the day off, and Wesbrook did so. In light of the complaints about Wesbrook and his absence from the meeting, Ulrich fired Wesbrook. However, at Vidaillet's behest, and by the narrow vote of nine to eight, the Clinic's board of directors overruled Ulrich and reinstated Wesbrook on September 7, 2010.

While Wesbrook narrowly avoided termination in 2010, students of organizational behavior will not be surprised to learn that tensions at the Research Foundation continued to simmer. In March 2011, three administrators of the foundation's research centers complained to Keefe in human resources about Wesbrook's micromanagement and his pattern

of retaliation. In July, a veteran research scientist resigned because she "wanted to get away from Dr. Wesbrook." Another scientist resigned that same month. Before leaving, he spoke with Belongia about the administrative environment at the Research Foundation, which he characterized as "increasingly adversarial" and plagued by "conflict, inaction, and dysfunction."

### D. *The Belongia Letter*

In November 2011, Jordon Ott resigned from the Research Foundation. She was a research administrator who reported directly to Belongia. She told Belongia that her frustration with Wesbrook was a "key factor" in her decision. Belongia then sent a letter to Ulrich identifying four broad categories of concern with Vidaillet's and Wesbrook's leadership of the Research Foundation. This letter became the basis for Wesbrook's claim in this suit against Belongia.

Belongia wrote that several scientists and staff had expressed their frustration to him in confidence, while others had "already filed complaints with Human Resources regarding the Deputy Director." In Belongia's words, Wesbrook had also used "coercion and intimidation in his interactions with scientists and administrators." Belongia said that he could "provide specific examples" and that other employees could "corroborate this and provide other examples."

### E. *The Performance Improvement Plan, the Ulrich Chronology, and Wesbrook's Termination*

In the summer of 2011, Ulrich had directed the Clinic's process improvement group to evaluate the time commitment associated with Vidaillet's position as director of the Research

Foundation. During the evaluation, several employees volunteered complaints about Wesbrook, including that he had created a hostile work environment and that employees feared retaliation if they voiced their concerns. The Clinic's board of directors reviewed these findings at a September 6, 2011 meeting. At the end of that meeting, the board directed Vidaillet and Ulrich to develop jointly a performance improvement plan for Wesbrook.

Following the board meeting, Ulrich coordinated with Pauline Pritzl, a human resources manager, to draft an improvement plan suitable for Wesbrook's position. Ulrich and Pritzl presented the draft to Vidaillet, who disagreed with it and prepared his own version. At a November 10, 2011 meeting, Vidaillet distributed his proposed improvement plan to Ulrich and Pritzl. Ulrich said that only one plan would be implemented, but he told Pritzl to incorporate any relevant sections of Vidaillet's proposal into the final draft. Pritzl did so, and Ulrich forwarded the integrated document to Wesbrook.

On December 8, 2011, Ulrich, Pritzl, Vidaillet, and Wesbrook met to review the proposed improvement plan. During the meeting, Wesbrook handed out a memorandum in which he responded only to those concerns identified in Vidaillet's version of the plan. Ulrich asked Pritzl, Keefe, and another human resources professional to review Wesbrook's memorandum. Each agreed it was not an appropriate response. The next day, Ulrich told Wesbrook that he could either resign or face termination. Ulrich then placed Wesbrook on administrative leave pending board review.

On December 19, 2011, Ulrich drafted a nine-page "Chronology" outlining Wesbrook's troubled history as deputy di-

rector, including his conduct during the performance improvement process. Ulrich sent the Clinic's board of directors a copy of the Chronology and Belongia's November 2011 letter. Ulrich also provided the board with a copy of a handwritten letter addressed to Vidaillet by Melvin Laird, a retired U.S. Representative from Wisconsin and U.S. Secretary of Defense, and a long-time supporter of the Marshfield Clinic. Laird's letter referred to a conversation in which Vidaillet had said he thought he was about to be fired. Laird wrote back that he had spoken with "over forty individuals" associated with the Clinic. Based on his conversations, Laird concluded that the problem at the Research Foundation was not Vidaillet but was instead Wesbrook.

After reviewing these documents and other submissions, the Clinic's board voted thirteen to two to support Ulrich's decision, up to and including termination of Wesbrook's employment. Ulrich then fired Wesbrook effective January 2, 2012.

F. *District Court Decision*

In 2013, Wesbrook filed this suit accusing Ulrich, Belongia, and two other former colleagues of tortiously interfering with his employment. The district court allowed Wesbrook's claims against Ulrich and Belongia to proceed to discovery. Ulrich and Belongia later moved for summary judgment.

Wesbrook's complaint had described the defendants' "sustained campaign" to have him fired, with allegations of "numerous false and defamatory statements" and actions on "multiple occasions … to interfere with [his] contract of employment." By the summary judgment stage, Wesbrook's theory of the case had narrowed considerably. He focused on

four allegedly false statements to the board of directors who had approved his firing: Belongia's observations that Wesbrook "coerced" employees and that employees "filed" complaints against him; Ulrich's description of the performance improvement process; and Laird's reference to talking with at least forty Research Foundation affiliates.

The district court granted the defendants' motion for summary judgment. Although the court acknowledged that Wesbrook's "evidence of internal strife within the Clinic is strong, especially as it concerns Ulrich's possible motives," *Wesbrook v. Ulrich*, No. 13-cv-494-wmc, 2015 WL 7871063, at *9 (W.D. Wis. Dec. 3, 2015), the court found that the undisputed facts showed that each of the challenged statements was true or at least substantially true. Ulrich's motives were therefore immaterial.

II.  *Analysis*

   A.  *The Law of Tortious Interference*

Under Wisconsin law, a claim for tortious interference with a contract requires proof of five elements: "(1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere." *Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. App. 2006). The parties dispute here the fifth element, whether the defendants' challenged statements were privileged.

Generally speaking, whether conduct is privileged from tort liability is a fact-sensitive question that takes into account

the "nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Id.* at 543; see also Restatement (Second) of Torts § 767 (Am. Law Inst. 1979) (listing seven factors). For instance, the "common interest" conditional privilege, which offers some protection for false statements in the workplace, may be forfeited "if the defendant acted from ill will or an improper motive towards the plaintiff." *Wolf v. F & M Banks*, 534 N.W.2d 877, 885 (Wis. App. 1995).

Wisconsin law recognizes an important exception to the ordinary multifactor inquiry about privilege. If a claim for tortious interference is based on statements that are true, the claim must fail as a matter of law. The Wisconsin Court of Appeals observed in *Mackenzie v. Miller Brewing Co.* that the "'transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract' or prospective contract." 608 N.W.2d 331, 349 (Wis. App. 2000), *aff'd*, 623 N.W.2d 739 (Wis. 2001), quoting *Liebe v. City Finance Co.*, 295 N.W.2d 16, 18 (Wis. App. 1980). Likewise, the drafters of the *Restatement* included section 772 as a "special application of the general test" outlined in section 767: "There is of course no liability for interference with a contract … on the part of one who merely gives truthful information to another." Restatement (Second) of Torts § 772 cmts. a, b (Am. Law Inst. 1979). Thus, while a defendant's motive is often relevant in deciding whether she tortiously interfered with a plaintiff's contract, motive is irrelevant when the defendant spoke the truth.

Further, a statement may be substantially true—and thus privileged—even if some fine splitting of semantic hairs might leave room to argue about its literal truth. See *Terry v. Journal Broadcast Corp.*, 840 N.W.2d 255, 264 (Wis. App. 2013). The *Terry* court explained: "It is not 'necessary that the … statement in question be true in every particular. All that is required is that the statement be substantially true.'" *Id.*, quoting *Lathan v. Journal Co.*, 140 N.W.2d 417, 423 (Wis. 1966).

*Terry* and *Lathan* were defamation cases. We are aware of no precedential Wisconsin decisions that have explicitly extended substantial truthfulness as a defense to tortious interference.[2] We see no principled reason, though, why the defense would not apply with equal force in this context. In the absence of contrary authority, we predict that the Wisconsin Supreme Court would apply it. See *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) ("Our task in a diversity case is to predict what the state's highest court would do if presented with the same issue.").

B.  *The Defendants' Truthful Statements*

Plaintiff Wesbrook's claims against defendants Ulrich and Belongia turn on the answer to one question: were the defendants' statements true or at least substantially true? The undisputed facts show that they were. Wesbrook bases his tortious interference theory on four statements that Ulrich published to the Clinic's board of directors: (1) Belongia's statement that

---

[2] One non-precedential opinion did so. See *Park Towne Dev. Corp. v. Gotta Madison Assocs.*, 337 N.W.2d 856, 1983 WL 161457, at *3 (Wis. App. 1983) ("'[T]he transmission of truthful information is privileged … and cannot subject one to liability for tortious interference with a contract.' Substantial truth is all that is required.") (citations omitted).

Wesbrook used coercion in his interactions with other employees; (2) Belongia's statement that employees filed complaints against Wesbrook; (3) Ulrich's description of the performance improvement plan; and (4) Laird's statement that he spoke with over forty people. Wesbrook's quarrel with the first two statements involves semantic hairsplitting. His claim about the performance improvement plan misconstrues what Ulrich actually said. And his criticism of Laird's letter is both unsupported by the record and immaterial.

1. *Coercion*

Wesbrook complains about Belongia's assertion that Wesbrook "used coercion and intimidation in his interactions with scientists and administrators." Not so, Wesbrook protests. While conceding that he may have *intimidated* his co-workers, he claims he never *coerced* them. Coercion, Wesbrook argues, "entails overt acts," whereas "any individual may be unintentionally intimidated by another's personality, size, knowledge or skill." Wesbrook points to Belongia's 2015 deposition testimony acknowledging that he had not personally been "coerced" by Wesbrook and could not recall a specific example of an individual who had experienced such "coercion."

The district court pointed out correctly that the terms "coercion" and "intimidation" are often used interchangeably. For instance, the *American Heritage Dictionary of the English Language* (fifth edition) defines "coerce" as to "pressure, intimidate, or force (someone) into doing something." Likewise, *Webster's Third New International Dictionary of the English Language* defines "coerce" as to "restrain, control, or dominate,

nullifying individual will or desire (as by force, power, violence, or intimidation)."[3]

The undisputed facts show that some of Wesbrook's colleagues found him overbearing. As David Keefe in human resources reported, former colleagues described Wesbrook's management style as, among other things, cold, militaristic, confrontational, and contentious. One scientist described Wesbrook as "intimidating and vindictive," while another left her position due in part to the "hostile treatment" she had received from Wesbrook. A veteran clinician recounted complaints from employees who "feared retribution if they said anything that was contrary" to Wesbrook. It is undisputed that Ulrich, Belongia, and the Clinic's board of directors had received this information. It strains credulity beyond the breaking point to suppose that the board would have been unmoved by these reports of Wesbrook's bullying and retaliation but was finally spurred to action by a reference to "coercion." We will not split hairs so finely. Tort law does not demand such artificial precision in ordinary use of language. Belongia's statement that Wesbrook used "coercion and intimidation" was at least substantially true, so the statement was privileged as a matter of law.

2. *"Filed" Complaints*

Wesbrook next takes issue with Belongia's assertion that some Research Foundation scientists and staff had "already

---

[3] In paragraph 94 of his own proposed findings of fact, Wesbrook himself used the term "coerce" in the same way, without referring to threats of physical force. He described one of Ulrich's shareholder communications as a "ploy to coerce the shareholders into approving [his] reorganization plan."

filed complaints with Human Resources regarding the Deputy Director." Wesbrook contends this statement was false because no formal written complaints were actually "filed." In his deposition, Belongia admitted that he had "intended to say" that employees had "complained to human resources" and that in retrospect the word "filed" was "probably not the optimal word to use." Wesbrook contends that "filing" a complaint necessarily "connotes starting a formal investigative process … which could lead to some type of sanction against the administrator or formal intervention on behalf of the aggrieved employee." Conversely, "complaining"—according to Wesbrook—is "akin to griping, blowing off steam, taking advantage of a sounding board, or requesting advice about how to deal with an issue."

Wesbrook offers no authority, linguistic or otherwise, suggesting that tort liability should depend on his proposed distinction between "complaining" to human resources and "filing" a complaint with human resources. The distinction is unpersuasive, particularly on this record. Undisputed evidence shows that employees of the Research Foundation were not simply "griping" to one another about Wesbrook. They met with supervisors and human resources personnel to express their concerns and, presumably, to seek some kind of resolution. Many had even chosen to resign to get away from Wesbrook.

The undisputed facts show that Belongia was aware of growing dissatisfaction with Wesbrook's leadership. His own research administrator, Jordon Ott, was among those who departed during the final months of Wesbrook's tenure. By writing that some employees had "already filed complaints with

Human Resources," Belongia accurately reflected the circumstances at the Research Foundation as of November 2011. Belongia's statement was at least substantially true, so it was privileged as a matter of law.

### 3.  *Performance Improvement Plan*

Wesbrook complains next about Ulrich's description in his Chronology of the performance improvement process. According to Wesbrook, Ulrich falsely "alleg[ed] that Wesbrook had failed to comply with a performance improvement plan." This contention is a straw man. Ulrich made no such assertion.

In his Chronology, Ulrich acknowledged the decision by the Clinic's board of directors that he and Vidaillet should jointly develop an improvement plan for Wesbrook. Ulrich described meeting with Vidaillet and with Pauline Pritzl in human resources to work on the plan. Ulrich noted that Vidaillet prepared his own draft and that Ulrich instructed Pritzl to incorporate relevant portions of that draft into the final document. Ulrich also described the November 15, 2011 meeting with Wesbrook, in which Ulrich told Wesbrook that there was only one improvement plan and "that was the one that [Ulrich] had provided." Finally, Ulrich recounted the December 8, 2011 meeting at which Wesbrook circulated his response to the improvement plan and the later meeting in which Ulrich gave Wesbrook the ultimatum to resign or be fired.

At no point in the Chronology did Ulrich assert that Wesbrook failed to comply with his performance improvement plan. Rather, it was Wesbrook's deficient response to the proposed plan that triggered his termination. The Clinic's

board of directors had instructed Ulrich and Vidaillet to pre-pare a joint document, and according to Vidaillet, the board had ordered that the "plan be brought back … for approval." That never happened. Instead, at an October 11, 2011 meeting, the board decided that the "question of Wesbrook's perfor-mance improvement plan would be part of the Board's sched-uled March 2012 evaluation of [Vidaillet]." The board could not have harbored any doubt about the status of Wesbrook's compliance with a performance improvement plan that it had never approved.

Ulrich's account of the performance improvement process was truthful and thus privileged as a matter of law. In addi-tion, Wesbrook's hypothetical non-compliance with an im-provement plan that the Clinic's board had never adopted could not have caused his termination and so cannot serve as the basis for a tortious interference claim. See *Briesemeister*, 720 N.W.2d at 542 (one element of a tortious interference claim is "a causal connection between the interference and damages").

### 4. *Laird Letter*

Finally, Wesbrook contends that Ulrich gave the Laird let-ter to the Clinic's board of directors without properly verify-ing its contents. Wesbrook asserts that Laird had "at best a tenuous grasp on the circumstances regarding Wesbrook's and Vidaillet's conflict with Ulrich and Belongia," and Wesbrook faults Laird for saying that he spoke with at least forty Research Foundation affiliates, a statement Wesbrook deems "incorrect."

In his deposition testimony, however, Laird insisted that his letter was "factually correct." Laird testified that he may

have spoken with "a hundred" people, and he reiterated that while his reference to forty people was an estimate, he probably spoke with more than forty people. To rebut Laird's testimony and present a genuine issue of material fact, Wesbrook has offered no evidence, nothing more than raw speculation. In any event, we do not understand how the number of people Laird contacted could support Wesbrook's theory of tortious interference. Wesbrook has no evidence to dispute the salient point, which is that a substantial number of Research Foundation affiliates told Laird that their problem was not with Vidaillet but with Wesbrook.

We need not belabor the point. Wesbrook has failed to offer any evidence that any material statement in the Laird letter is untrue. The letter is therefore privileged as a matter of law.

C.  *The Preston Decision*

Because the statements on which Wesbrook bases his claims against Ulrich and Belongia were each true or substantially true, we agree with the district court that no reasonable jury could find tortious interference on this record. Wesbrook's argument to the contrary gains no additional traction by his attack on *Preston v. Wisconsin Health Fund*, 397 F.3d 539 (7th Cir. 2005), in which we addressed Wisconsin's law of tortious interference in the context of employment. For the sake of completeness, we address Wesbrook's *Preston* argument, which highlights the larger stakes here.

In *Preston*, the former director of a dental clinic brought a tortious interference claim against the CEO and another dentist claiming that the CEO's decision to fire him had been tainted by an improper motive. *Id.* at 540–41. (The CEO had replaced Preston with the other dentist, with whom the CEO

allegedly had a romantic relationship.) In affirming summary judgment for the defendants, we explained that an employee who alleges tortious interference by a co-worker or supervisor must prove "both that the employer did not benefit from the defendant's act and that the act was independently tortious, for example as fraud or defamation." *Id.* at 544. Wesbrook challenges that two-prong test. He contends that *Preston* improperly modified the elements of a tortious interference claim under Wisconsin law, and he urges us to overrule *Preston*. For two reasons, we decline.

First, the Wisconsin judiciary has given no indication that it disagrees with *Preston*. In nearly twelve years since *Preston* was decided, no Wisconsin court has disapproved or even distinguished it.[4] We do not lightly overturn circuit precedent, and we give "considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments." *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006) (citation omitted), *aff'd*, 553 U.S. 507 (2008). The state courts are quite capable of signaling when they disagree with

---

[4] We know of only one non-precedential Wisconsin opinion that has even mentioned *Preston*: *Westphal v. Smelser*, 756 N.W.2d 809, 2008 WL 2609698, at *6 (Wis. App. 2008) (citing *Preston* for the unremarkable proposition that employment at will qualifies as a contractual relationship). Also, if Wesbrook believed that Wisconsin courts might disapprove *Preston* if squarely presented with the question, he could have filed his complaint in state court. If he had done so, the defendants could not have removed the case to federal court because three of them were Wisconsin citizens when the suit was filed. See 28 U.S.C. § 1441(b)(2). Cf. *Stamp v. Insurance Co. of North America*, 908 F.2d 1375, 1379 (7th Cir. 1990) ("We are not sympathetic to plaintiffs who opt for a federal forum, lose, and then want a second opinion from a state court.").

a federal court's interpretation of state law. See, e.g., *United National Ins. Co. v. DePrizio*, 705 N.E.2d 455 (Ind. 1999) (disagreeing with Seventh Circuit prediction of Indiana law on whether umbrella liability coverage limits applied to underinsured motorist coverage); *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 739 N.E.2d 1263, 1272 (Ill. 2000) (disagreeing with Seventh Circuit prediction that Illinois common fund doctrine applies only in class actions and insurance subrogation cases). Absent signals from the state courts or other developments that call into question an earlier *Erie Railroad* prediction, the principle of stare decisis controls. See *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457 (7th Cir. 2005) (discussing the principle).

Second, we think *Preston* was decided correctly. If *Preston* had allowed the plaintiff's tortious interference claims to proceed to trial, it would have opened a rather broad avenue under tort law to bypass well-established limits on contract remedies for at-will employees. Fired at-will employees who have no remedy under contract law would have an incentive to sue not their employers for breach of contract but their former coworkers and supervisors in tort. Under Wesbrook's theory, a fired at-will employee would be entitled to a jury trial if there were evidence of ill will or malice on the part of a former coworker or supervisor who participated in a firing decision. Such evidence would not be rare. Such a new avenue under tort law would likely "transform employment at will into employment terminable only for cause," *Preston*, 397 F.3d at 543, as the threat of personal liability in a lawsuit could easily discourage supervisors from taking adverse employment actions.

In Wisconsin and elsewhere, there is a "strong presumption that an employee contract is at will unless the terms of the contract state otherwise." *Heinritz v. Lawrence University*, 535 N.W.2d 81, 83 (Wis. App. 1995). While the policy choices reflected in the doctrine of at-will employment are open to debate, the choice of those policies is a matter of state law to be decided by state legislatures and courts. We see no sign that Wisconsin would be inclined to open this tort detour around roadblocks of contract law in cases like this.

The district court correctly entered summary judgment for the defendants. The judgment of the district court is AFFIRMED.